PRECISION SHOOTING EQUIPMENT COMPANY and Paul E. Shepley, Jr., Plaintiffs-Appellees,

and

Bear Archery Company, Division of Victor United, Inc., Intervening Plaintiff-Appellee,

v.

Holless W. ALLEN and Allen Archery, Inc., Defendants-Appellants.

No. 78–2357.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1980.

Decided April 7, 1981.

Theodore H. Lassagne, Los Angeles, Cal., for defendants-appellants.

William E. Pelton, New York City, for plaintiffs-appellees.

Before WOOD and CUDAHY, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from an interlocutory order and preliminary injunction entered in a dispute between the licensee of a patent challenging the validity of the patentee's patent in a declaratory judgment action.[1] The preliminary injunction provides that the patentee may not terminate the license during the pendency of this litigation so long as the licensee pays into the court's escrow account accruing post-challenge royalties. The licensee has not renounced its license and continues to mark its products with the patentee's patent number as permitted under the terms of the temporary injunction.[2]

This litigation was instituted by Precision Shooting Equipment Company seeking a declaratory judgment as to the validity of the patent, to which it claimed to be a non-exclusive sublicensee, issued to defendant Holless W. Allen and assigned by him to defendant Allen Archery, Inc. (Allen). Various other licensees of Allen, including Bear Archery Company (Bear), intervened, all challenging the validity of the Allen patent. Bear secured the particular order and temporary injunction against Allen on September 6, 1978, which Allen now appeals. Only Allen, patentee, and Bear, licensee, are involved in this appeal. There is no dispute about the facts, only on two issues of law, the first jurisdictional and the second, the propriety of permitting Bear the protection of the patent while at least temporarily withholding the royalties in escrow from Allen.

### Jurisdictional Issue [3]

It is Allen's position that a valid license is an absolute defense to a patent infringement action, since Bear, as licensee, can have no reasonable apprehension of liability in an infringement suit. *Arvin Industries, Inc. v. Berns Air King Corp.*, 510 F.2d 1070 (7th Cir. 1975). That proposition is not disputed, but Allen uses that base to argue that there is therefore no "actual controversy," a constitutional requirement, even though diversity may exist as it does in this case.[4] To support its position, Allen relies in part upon joint consideration of *Milprint, Inc. v. Curwood, Inc.*, 562 F.2d 418 (7th Cir. 1977), and *Winsor v. Daumit*, 185 F.2d 41 (7th Cir. 1950). Allen also directs our attention to *Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 313 F.Supp. 253 (D.Del.1970), dismissing an action by a licensee challenging the validity of a patent, and asks that it be compared with *Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 319 F.Supp. 218 (D.Del.1970), in which the court refused to dismiss a similar suit after termination of the licensee's license. Both decisions were affirmed in *Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 448 F.2d 1328 (3d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972).

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. The underlying dispute concerns United States Letters Patent 3,486,495 entitled "Archery Bow with Draw Force Multiplying Attachments."

2. This case has a procedural history which we see no need for our purposes to recount in detail. It spans the creation of a new judicial district and various orders of Chief Judge Morgan, Judge Baker, and this court.

3. This issue is raised for the first time on appeal, but being jurisdictional is nevertheless considered, contrary to the general rule applicable to other newly raised issues. *Arvin Industries, Inc. v. Berns Air King Corp.*, 510 F.2d 1070, 1072 (7th Cir. 1975); *Lion Mfg. Corp. v. Chicago Flexible Shaft Co.*, 106 F.2d 930, 933 (7th Cir. 1939).

4. The Declaratory Judgment Act, 28 U.S.C. § 2201, limits declaratory judgments to actual controversies in conformity with Article III, Section 2 of the Constitution, restricting jurisdiction to "cases" and "controversies." The Declaratory Judgment Act provides a procedural remedy but confers no new jurisdiction. *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950).

Bear rejects the argument that merely because Bear's license has not been terminated there exists no real controversy between Bear, licensee, and Allen, patentee. In support of its position Bear cites *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184 (2d Cir. 1972), *American Sterilizer Co. v. Sybron Corp.*, 526 F.2d 542 (3d Cir. 1975), seeks in part to distinguish *Milprint*, and generally urges acceptance of jurisdiction when diversity exists on the basis of the strong public policy statement in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

The "actual controversy" issue in this context casts some shadows not easily illuminated. Subject matter jurisdiction is alleged to be based upon diversity of citizenship of the parties with an amount in controversy in excess of $10,000. 28 U.S.C. § 1332. That is not disputed, but Bear also argues that diversity requires acceptance of "actual controversy" jurisdiction in light of *Lear, Inc. v. Adkins*, since Bear claims to be faced with a reasonable apprehension of an infringement action once it terminates royalty payments. Bear also cites *Milprint*, 562 F.2d at 422 n. 5, in which we commented that apparent diversity jurisdiction, not mentioned in the prior opinions of this court in two other declaratory actions by licensees,[5] "explains this court's unquestioning acceptance of jurisdiction." In *Milprint* we were faced with a different aspect of patent litigation. Milprint, the licensee, had ceased making royalty payments to Curwood under its license. Curwood filed suit for royalties in the state court followed by Milprint's action in the district court seeking a declaration that the patent was invalid, that no further royalties were due, and further seeking recoupment of previously paid royalties. We affirmed the district court's dismissal of the action on the basis that Milprint in essence sought in federal court only to assert a defense to a pending state action. It is, we held, the character of the pending state court action, a contract suit for royalties, and not the

alleged invalidity defense which determines whether there is federal question jurisdiction. We therefore declined to determine patent validity which was intended to constitute a defense in a contract suit in state court. 562 F.2d at 422. No issue of "actual controversy" was raised in that case. Because it is distinguishable, our view of the present case is not controlled by *Milprint*.

Allen, as we have mentioned, argues that our decision in *Winsor v. Daumit, supra*, must be read with *Milprint* to determine if diversity alone is enough to confer jurisdiction. We will therefore examine *Winsor*, a diversity case. The plaintiff, Kathleen Winsor, author of Forever Amber, entered into a contract permitting Daumit to adopt the words "Forever Amber" as a trademark for his cosmetic products and agreed that the mark would be Daumit's sole property. She further agreed to help promote the sale of the products for a percentage of the gross sales. She sued for that unpaid percentage. Daumit counterclaimed seeking a declaratory judgment that Winsor's copyright of her book title gave her no right to use the title as a trademark for cosmetics and that the mark belonged to Daumit. We affirmed the dismissal of the counterclaim upon the basis that there was no "actual controversy" between the parties other than the plaintiff's charge of breach of contract. Winsor did not deny that Daumit had the right to use "Forever Amber." Her suit was for the contractual compensation due her for cooperation in promoting the cosmetic sales. The original contract had provided that "Forever Amber" as a mark applied to cosmetics was the sole property of Daumit. It is obvious that *Winsor* is easily distinguishable from the present case, but it does stand for the proposition that there must be an "actual controversy," and that diversity alone does not satisfy all jurisdictional requirements. Neither *Milprint* nor *Winsor*, considered separately or together, dictate any particular result in the present case.

**5.** *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097 (7th Cir. 1975); and *Beckman Instruments, Inc. v. Technical Development Corp.*, 433 F.2d 55 (7th Cir. 1970), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971).

■ Diversity between the parties is not an ingredient of "actual controversy." It must be remembered that the issue to be determined in the present case is whether an "actual controversy" exists while the license is still in use, diversity or no diversity. In general a "controversy" is more than just a disagreement. It must be justiciable. A court will not render advisory opinions or expound on academic or moot questions merely to satisfy the curiosity of the parties. "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests" susceptible to specific relief. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Winsor v. Daumit*, 185 F.2d at 43. The controversy, in addition, must be in regard to a federal question, in this case the validity of Allen's patent, or otherwise meet diversity requirements. These latter aspects of the matter are not in dispute. Even so, the application of the general "controversy" rule to a particular patent matter is not easy and may involve a determination of whether in a gray area the gray is dark enough. The determination of controversy between licensee and patentee does not qualify as a scientific exercise.

In the present case, the licensee is still operating under the license and paying the royalties, not to the licensor, but into court pending the resolution of the validity issue. The patentee is not receiving its royalties, but they are accumulating in a safe place for Allen if it is found to be entitled to them. The trial court has prohibited the termination of the license. Before placing this gray area into a legal spectroscope, some additional surrounding circumstances must be noted. In addition to the other licensees challenging validity in this action, Allen, at the time Bear intervened, was already engaged in infringement actions against a former licensee and another manufacturer in other jurisdictions.

These additional facts are significant here because Allen also relies on the *Thiokol* cases to support its view that a valid license

precludes any reasonable apprehension of an infringement suit and thus there can be no actual controversy. In the first *Thiokol* suit, the licensee sued the patentee seeking a declaratory judgment that the patent was invalid. On the theory that the validity of the patent could arise only as a defense in a suit by the patentee for breach of contract to pay royalties, the district court was affirmed in its dismissal. After that dismissal the situation developed further. The licensee brought a similar suit after being sued by the patentee for unpaid royalties in a state court and after the termination of the license. This time the district court denied the motion to dismiss and was affirmed on the basis that the termination of the license agreement removed the obstacle to federal jurisdiction and left a justiciable controversy. Four years later in *American Sterilizer Co. v. Sybron Corp., supra*, the Third Circuit after considering *Lear* held that a licensee may challenge patent validity in a declaratory judgment proceeding without first terminating the license. *Thiokol* in that circuit appears to be limited to cases lacking diversity jurisdiction.[6]

*Lear* has caused some disarray among the circuits when its policy pronouncements have been extracted to be applied in other contexts. *Lear* overruled *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), by holding that a licensee is not estopped to interpose the invalidity of the patent as a defense to an action by the licensor to enforce the license agreement. The policy supporting the lifting of the license estoppel limitation was explained:

Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay

---

**6.** *See* 526 F.2d at 549 n.13.

tribute to would-be monopolists without need or jurisdiction.

395 U.S. at 670, 89 S.Ct. at 1911. *Lear* confers no new jurisdiction on federal courts. In determining, however, whether an "actual controversy" exists in a particular circumstance, a determination which cannot be mechanically arrived at, the *Lear* rationale deserves to have some influence.

The Third, as we have seen in *Thiokol*, and the Tenth Circuits, appear to have taken the position in some circumstances that so long as there is a valid license the federal court has no jurisdiction to determine a patent validity charge. *Product Engineering & Mfg., Inc. v. Barnes*, 424 F.2d 42 (10th Cir. 1970). *Components, Inc. v. Western Electric Co.*, 318 F.Supp. 959 (D.Me.1970), adopted a similar approach. This circuit by reason of *Milprint* has been considered by some to be in that category. However, in contrast the Circuit Court of Appeals for the District of Columbia, and district courts in the Eighth and Ninth Circuits have been influenced by *Lear* and have permitted challenges to patent validity during the pendency of the license. *Warner-Jenkinson Co. v. Allied Chemical Corp., supra; Hanes Corp. v. Millard*, 531 F.2d 585 (D.C.Cir. 1976); *Medtronic, Inc. v. American Optical Corp.*, 327 F.Supp. 1327 (D.Minn.1970); *Sargent Industries, Inc. v. Lear Siegler, Inc.*, 200 U.S.P.Q. (BNA) 251 (C.D.Cal.1977).[7]

*Milprint* should not be interpreted as concluding that in this circuit a valid license necessarily and always precludes jurisdiction to entertain a licensee's challenge to the validity of the patent. In *Milprint*, as we have noted, the licensee only sought to test out his invalidity defense to a pending state court action brought by the licensor. Our prior holding in *Beckman Instruments, Inc. v. Technical Developments Corp.*, 433 F.2d 55 (7th Cir. 1970), *cert. denied*, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326 (1971), may also be subject to the interpretation that license termination is always a

precondition to a validity challenge by a licensee as otherwise there would be no actual controversy.[8] *Beckman*, however, if read that way is being misinterpreted. In *Beckman*, the licensee sued the licensor seeking a declaration of invalidity, non-infringement of a particular patent in a licensing package, and in addition, charged various forms of patent misuse through the provisions of the licensing agreement. On the validity issue, no "actual controversy" issue was raised. However, it may be that any misreading of the case is generated by a discussion of the termination provision of the package license agreement which provided in part that the licensee would have to abandon a particular field of its operations unless it paid royalties regardless of whether the licensee actually made use of a patent. Since it was not alleged by the licensee that it intended to terminate its royalty obligation, there was no actual controversy about that narrow termination issue of the license agreement, a contract issue. *Beckman* cites in support *Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87 (2d Cir. 1963). In that case the plaintiff, not a licensee, sought a declaration that the patentee's license was invalid. That court held that because the plaintiff had failed to allege that it might actually be already engaged in infringing conduct or had the immediate intention and ability to do so, there would be no actual controversy. *Wembley* is not relevant to the present case. Neither *Milprint* nor *Beckman* control.

So do we have an "actual controversy"? We think sufficient controversy has been alleged in this case to meet the constitutional standard. The controversy, among other things as we have noted, must be "definite and concrete," "appropriate for judicial determination," not hypothetical or abstract, but "real and substantial." But in the final analysis "when all the axioms have

---

7. For a discussion of these cases and the conflicts in the circuits, see Smith, *Foreclosure of Licensee Validity Challenges with Procedural Barriers: Federal Jurisdiction*, 16 Idaho L.Rev. 177 (1980); 61 J.Pat.Off.Soc. 690 (1979).

8. 16 Idaho L.Rev. at 196; 61 J.Pat.Off.Soc. at 714–15.

been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Public Service Commission of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). A court must be able to see the legal issue to be decided, the effect its decision will have on the parties and that some useful purpose can be achieved. 344 U.S. at 244, 73 S.Ct. at 240.

The legal issue is the validity of the patent. The decision will impact upon the business dealings between the parties. The useful purpose served is to bring the contest to an end between the parties and in the spirit of *Lear* to test out whether or not the patentee is entitled to the monopoly and royalties it claims or whether what it seeks to protect for itself is really part of the public domain. The licensee, with its payment of royalties dependent upon validity, usually is the one with enough at stake to justify instigating a validity determination. The licensee need not sit back and continue to wonder if it is justly paying royalties or merely paying a bribe to the patentee not to threaten him with business disruption and a possible damage suit if he terminates royalty payments. On the other hand, the owner of a patent should be protected from needless defense of his invention in expensive and burdensome litigation. *American Needle & Novelty Co. v. Schuessler Knitting Mills, Inc.*, 379 F.2d 376, 379 (7th Cir. 1967). It would, of course, not be desirable to stifle invention.

There is another ingredient needed in trying to bring these diverse interests into some balance. The licensee must first suffer a reasonable apprehension that the patentee will bring an infringement suit against him if there is non-compliance with the license. *Milprint, Inc. v. Curwood, Inc.*, 562 F.2d at 421. That apprehension was specifically alleged in Bear's complaint based upon the other infringement lawsuits already brought by Allen against other manufacturers of the product.[9] One of the objections of Allen in this appeal is that it is temporarily enjoined from terminating Bear's license. Therefore, if not for the injunction it is obvious Allen would seek to terminate the license because it does not have possession of the escrowed royalties. Termination of the license due to failure to pay royalties, in light of the other litigation previously made known to Bear by Allen, forecasts a suit for damages against Bear.

It is a practical and sensible temporary solution while validity is determined to permit the licensee to continue under the license by paying the royalties into the court's escrow account in safekeeping for Allen if it is determined that Allen has a valid patent entitling it to those royalties. On the other hand, if it is determined that Bear is paying royalties for nothing, its post-challenge royalties will likewise be in safekeeping for return by the court. The financial risk for both parties is minimized. We see no need to force a party to take some additional act to deepen gray into black and to expand the potential of litigation resulting in further business disruption

---

**9.** Bear's complaint alleged in part:

6. On information and belief, the defendants have initiated lawsuits in several jurisdictions alleging, *inter alia*, infringement of U.S. Patent 3,486,495 on the part of other manufacturers of "compound bows". On the basis of its allegations contained herein that U.S. Patent 3,486,-495 is invalid and unenforceable, BAC has ceased paying royalties under the aforesaid license agreements directly to defendant Allen Archery, Inc., and instead is seeking leave to pay royalties due under the existing agreement into this Court. Upon information and belief, defendant Allen Archery, Inc. has sued or counterclaimed against at least one other licensee who has ceased paying royalties and/or has sought leave to pay royalties into Court. BAC therefore has more than a reasonable apprehension that it too will be sued for infringement of the foregoing patent and that defendants will seek to terminate its license agreement and will also seek an injunction to disrupt BAC's commerce in "compound bows" and to attempt to prohibit it from the manufacture, use and sale thereof.

7. An actual controversy exists between BAC and defendants concerning the validity and enforceability of U.S. Patent 3,486,495 and declaratory relief is therefore necessary and proper.

while we pretend in the meantime that there is no actual controversy.

We find there is sufficient controversy for jurisdiction.

### Post-Challenge Royalties

The remaining related issue questions the trial court's injunction permitting Bear to continue marking its product while paying the post-challenge royalties not to Allen, but into the court's escrow account while at the same time enjoining termination *pendente lite* of Bear's license by Allen. Allen is saying, relying on *Kraly v. National Distillers & Chemical Corp.*, 502 F.2d 1366 (7th Cir. 1974), that Bear should not be given the opportunity to recoup the royalties accumulating in escrow while Bear is still marking its product awaiting a validity determination. Allen claims those interim royalties as its own regardless.

The district court read *Kraly* so as to permit Allen to recoup all royalties due from Bear up until the time Bear intervened and challenged Allen's patent. Those royalties accruing under the license were therefore not escrowed. However, *after* Bear's challenge all royalties accruing under the license were directed to be paid into escrow. Allen reads *Kraly* as holding that it is immediately entitled to all the royalties without any detour into escrow as long as Bear marks its products and has the protection of the patent. Allen claims it is entitled to royalties up until the time the license may actually be renounced by the licensee. Neither view is a totally unjustified interpretation, but *Kraly* imposes no straightjacket on the present case.

In *Kraly* we held that the licensee was not estopped from challenging the validity of the patent even though a consent decree entered in prior litigation by which the licensee gained the license provided that the licensee would not challenge the patent. The patent was found to be invalid, but the patentee was allowed royalties up until the time that the licensee stopped marking its products on the equitable principle that the licensee had enjoyed the benefit of the license during that period. In the present case, the district court noted that in *Kraly* the licensee stopped marking only several months after the challenge of invalidity arose in the litigation and interpreted that to mean that the litigation challenge by the licensee was at least as important a consideration as the termination of the marking. The controversy in *Kraly* had originally arisen because the licensee claimed the patentee violated the license by failing to take action against unlicensed sales by others. In *Kraly* no issue was originally raised or briefed by the parties in the district court as to when the royalty obligation terminated or who was entitled to what. The thorough district judge went ahead and resolved the unaddressed question on his own. 177 U.S.P.Q. (BNA) 364, 370 (N.D.Ill.1973). It is questionable whether Bear is actually enjoying any benefit from the license.

The present case has some further different factual ingredients not yet mentioned. The district court found that should Bear prevail and the patent was held to be invalid that Bear would be unable to recover any royalties already directly paid to Allen, and further that there was a reasonable likelihood of success by Bear in its challenge to validity. Those findings suggested the escrow arrangement as an equitable as well as practical temporary resolution for both parties. Escrow was not an entirely new idea in these circumstances. *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099–1100 (7th Cir. 1975). In *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1, 7 (6th Cir. 1974), it was found to be a commendable procedure since it preserved the royalties until patent validity could be resolved. The patentee had the assurance that if it ultimately prevailed on validity the accruing royalties would be immediately payable with interest without additional proceedings. Risk for the patentee, as well as for the licensee, was therefore minimized.

In *USM Corp. v. Standard Pressed Steel Co.*, following about a year after our *Kraly* decision, we noted that *Kraly* had determined entitlement to unpaid royalties by the application of equitable principles and

relevant policy considerations. We found it unnecessary at that stage of the *Steel* case, it being before us on an interlocutory appeal, to decide whether the patentee or licensee would ultimately be entitled to royalties attributable to the period of the pendency of the litigation, but we did decide that entitlement would not depend on who had possession of the royalties. The licensee sought a preliminary injunction against termination of the license offering to pay the royalties into escrow so that they might be returned if the patent was found to be invalid but preserving its rights under the license. The royalties, however, were to be delivered from escrow to the licensor in the event the patent was found valid, much like in the present case. We held that there was no need for a preliminary injunction because there was no contention that the licensor would be unable to refund royalties if the patent was ultimately held invalid, a finding contrary to the finding in the present case. 524 F.2d at 1100. We postponed until another day when it might be necessary to decide the issue of entitlement to interim royalties.

That day has arrived. Notwithstanding *Kraly*, the decision of this court in *Steel* viewed entitlement of interim royalties as an open question. There would have been no need to consider an escrow arrangement had *Kraly* been viewed as controlling. Under the circumstances in *Steel*, royalty entitlement was determined not to be ready for resolution partly because both parties had briefed and argued only on the assumption that royalties accruing during the pendency of the litigation depended on who had possession of the royalties at the time of final determination of validity. Possession during the interim, this court held, was not controlling, but this court went no further. It was said that when the question might be more fully and satisfactorily briefed, this court could better consider the question. The present case is also an interlocutory appeal, but we see no advantage at this time to the court or the parties in postponing resolution further. The problem was carefully analyzed by Judge Baker and has been briefed and argued by the parties in this appeal. Since there has already been a finding of Bear's likelihood of success on the merits, there is no need to wait until the same issue may be presented when validity is ultimately determined. Also, Allen claims it is entitled to the accumulating royalties without delay. We concur with Judge Baker's analysis and briefly consider each possibility.

Bear argued below, but not here, that in the event of invalidity it should be entitled to all the royalties ever paid under the license, not just post-challenge royalties. That approach would permit the licensee to enjoy the protection of the patent during its term while harboring the intent of later suing to recover all royalties paid. That rule would not stimulate an early validity test as suggested by *Lear*, but would lend itself to abuse. *Troxel Manufacturing Co. v. Schwinn Bicycle Co.*, 465 F.2d 1253 (6th Cir. 1972), *appeal after remand*, 489 F.2d 968 (1973).

Allen urges here that we adopt the "renunciation" rule which would entitle the patentee to recover all royalties so long as the licensee continues to mark its product and fails to renounce the license. Since Bear continues to mark, Allen would be entitled immediately to all the royalties accruing in escrow. Following our decision in *Kraly*, in addition to the reluctance to embrace a broad application of *Kraly* as seen in *Steel*, some of that same reluctance can be sensed in *Crane Co. v. AeroQuip Corp.*, 504 F.2d 1086 (7th Cir. 1974). In *Crane* we declined to decide whether the defendant was liable by reason of marking. The renunciation rule requires the licensee to prejudge validity, stop marking and paying royalties, and create a breach of the license. The licensee thereby assumes the risk that the patent may be valid. If his prejudgment turns out to be incorrect, he has presented the patentee with the option of rescinding the license and suing for infringement damages, which might exceed the royalties, or suing under the license for the royalties. Deliberately giving the patentee those options might be a risk a cautious licensee would not care to assume. A

licensee might well decide that business disruption, time, expense, and possible liability were not worth the risk, and would therefore continue to go along paying the agreed to royalties without questioning validity. That approach does not foster the policy teachings of *Lear*.

Another possibility is to adopt the "eviction" rule which would permit the licensee to withhold or recoup all royalties accruing or paid only after final judgment of invalidity. Under that approach the licensee who prevailed in his invalidity challenge would, during the course of the litigation which may be expected to be extended, pay royalties for nothing of value. The patentee, on the other hand, would continue to benefit from his invalid patent. Given that prospect, it cannot be anticipated that a patentee doubtful of his own patent would be anxious to resolve the litigation since the litigation was continuing the royalty benefit to him. *Lear* teaches that the expeditious resolution of unresolved issues of patent invalidity may prevent the public from continuing unjustified payment of tribute to would-be monopolists. 395 U.S. at 670, 89 S.Ct. at 1911. Even more specifically *Lear* finds no reason for continuing royalty payments during the time licensees are challenging validity in the courts. That policy, it is pointed out, would only encourage dilatory tactics. 395 U.S. at 673, 89 S.Ct. at 1912. Allen argues, however, that the public policy in *Lear* would not be frustrated in a situation where Bear could keep its license *pendente lite* by escrowing royalties on the products which it does not choose to mark, but would be required to pay Allen royalties for products it did mark. That is a possibility suggested by an amendment to the injunction which provided that payment of royalties into escrow on products not marked would not constitute a breach of the license agreement. Allen claims that utilizing that possibility would require Bear to pay royalties only for the privilege of publicly claiming the protection of the patent it alleges is invalid. How-

ever, it increases the licensee's risk of a damage suit if the litigation results in an unfavorable invalidity finding. We see no advantage to that narrow and uncertain course.

Under the challenge approach adopted by the district court, all the post-challenge royalties are safely in escrow for whomever may be found to be entitled to them. It appears delay in resolution of the controversy favors neither party. Nor is either party made to assume risks not necessary to the resolution of validity. We adopt that approach. It is not a new one. *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1 (6th Cir. 1974). *Atlas* has been followed recently in the Ninth Circuit, *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309, 314 (9th Cir. 1977). Likewise in *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 188 (2d Cir. 1977), an appeal from the dismissal of a patent challenge by a licensee, the court in reversing noted that all royalties paid after the complaint was filed would be subject to restitution in the event of invalidity. The court declined, however, to order the royalties paid into escrow in the absence of any indication that the patentee might be judgment proof. In the present case the district court made up for that possible deficiency by its finding that Bear, if required to pay all royalties directly to Allen would have no adequate remedy at law to recoup the post-challenge royalties.[10]

We endorse the district court's approach to this case.

Affirmed.

---

**10.** The holding in this case is not intended in any way to reflect on the ultimate determination of the validity of the patent.